UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:17-CR-102-DCR-REW |
| | ) | |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| FLAVIO IBANDA BERNAL and LAURA | ) | |
| PEREZ-REYES, | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

Defendants Flavio Ibanda Bernal and Laura Perez-Reyes filed a joint motion to suppress. DE #27 (Motion). The United States responded in opposition. DE #33 (Response). Defendants jointly replied. DE #34 (Reply). The Court held a lengthy joint hearing on October 16, 2017, where it heard the sworn testimony of four witnesses and admitted two exhibits. DE #42 (Minute Entry Order). The Court later conducted a separate oral argument hearing. DE #49 (Minute Entry Order). The matters are ripe for consideration. For the following reasons, the Court **RECOMMENDS** that the District Judge wholly **DENY** the joint effort to suppress (DE #27).

## I.    FACTUAL BACKGROUND AND THE TESTIMONY[1]

The motion centers on events occurring on the afternoon and evening of July 25, 2017, stretching into the early morning hours of July 26, 2017. On or about July 25,

---

[1] The digital record captured the hearings, and the Court bases its analysis on facts it finds premised on that record, to include the accompanying briefing and hearing exhibits. The Court does not here purport to recount every single fact brought out during the 4.5+ hour evidentiary hearing; rather, the Court here merely summarizes the relevant proof and includes the facts critical to the decision.

1

Lexington Police Detective Matt Evans asked the DEA (via SA Troey Stout) to assist in an investigation concerning information he had received from a confidential informant (CI) that "a load of suspect drugs would be coming into our area from the Chicago, Illinois, area." DEA TFO Jose Batista, who has approximately 20 years of law enforcement experience, described officers knowing that "several kilos" of heroin were expected to arrive. Evans, with Lexington PD, had worked with this CI in the past; DEA SA Moore believed the CI to have worked with both the DEA and Lexington Police on various previous instances. Moore confirmed that he had been involved in previous operations this CI arranged.

The CI had told Evans that the transaction would occur near Stanton Way in Lexington, with the courier arriving approximately between 5:30 p.m. and 9:00 p.m. The DEA-6, tendered at the hearing, indicates the particular address of 1946 Stanton Way (the McDonald's in that area). DEA SA Jason Moore, a member of the surveillance team in the Stanton Way area, confirmed, though, that as the day developed, the timeline continued to get "pushed back," according to information received from Evans, with the driver expected to arrive later in that estimated timeframe. According to Moore, the CI "was making calls with the individual setting up this transaction"; the DEA "kept getting apprised of their [the driver's] whereabouts" as the afternoon progressed. Law enforcement ultimately knew to be watching for a vehicle with an Illinois license plate and that the McDonald's parking lot on Stanton Way was the pre-determined meeting place.

At approximately 9:16 p.m. on July 25, a dark Honda Element with an Illinois license plate pulled into the Stanton Way McDonald's parking lot and parked.[2] The driver and passengers—an adult male driver (later identified as Defendant Bernal), an adult female (later identified as Defendant Perez), and two minor children—went inside McDonald's and ate a meal for approximately 20 minutes. Law enforcement observed Bernal, during the time the group was in the McDonald's, periodically (more than twice) stand up from the table, approach a window, and look out toward the Element—specifically, in officers' assessment, fixing his gaze on and checking the Element. After "an extended period of time," about 45 minutes into their stay (*i.e.*, approximately 10:00 p.m.), when the group had not yet departed despite having finished eating, Agent Moore walked through the McDonald's himself and observed that the group had finished their meals and cleared their table. Moore observed Bernal then holding a cell phone in his hand. The group did not leave McDonald's until approximately 10:20 p.m., or nearly 45 minutes after they finished eating.

Kentucky State Police Trooper William Lindon, who has 14 years' police experience, was part of the team that day. On direction from SA Stout, Lindon walked toward the foursome—Bernal specifically—as they exited the McDonald's. That day, Lindon (along with Trooper Jack Gabriel, in a different cruiser, but "stationed together as a team") waited at the nearby Embassy Suites on Newtown Pike, ready to be responsive

---

[2] A second vehicle (a maroon SUV), which received much attention at the evidentiary hearing, also pulled in contemporaneously with the Element, parking in a different area. The DEA initially focused attention on this maroon SUV (with a Wisconsin license plate) because, as Agent Moore explained, officers observed the driver of the maroon SUV using a cell phone at times that matched when Evans said that the CI was actively communicating with the person negotiating the arrival of the drugs. The maroon SUV soon, though, departed the parking lot and drove toward a neighboring hotel. Law enforcement subsequently conducted a traffic stop on the maroon SUV, searched it, and recovered nothing of evidentiary value.

to any DEA requests for KSP assistance. Lindon knew that the DEA expected a kilo heroin buy in the Stanton Way area and that there was an informant involved. Around 10:16 p.m., the DEA requested that Lindon approach the dark Honda Element in the Stanton Way McDonald's parking lot with an Illinois plate, as well as the occupants of that vehicle. The DEA instructed Lindon, in a marked police car and in full uniform (including with a gun visibly holstered on his belt), to approach the individuals, begin a conversation, and investigate whether there were drugs in play. As the foursome exited McDonald's, Lindon learned via radio that the group was, in fact, the one associated with the Element, and he approached the individuals soon after they crossed the door threshold, right after they stepped off the sidewalk. Bernal, Lindon said, immediately had a slight initial physical reaction of "not wanting to make contact" with Lindon—Bernal "made eye contact" and had this reaction, which Lindon also described as Bernal "kind of taking a step" in a different direction, but not away from the Trooper. Notably, the entire Lindon encounter is audio taped, and the Court has audited the full exhibit.

Upon Lindon greeting the group by saying something in the nature of, "How are you all tonight?" though, Bernal engaged the Trooper in conversation. Lindon did not have to ask or command Bernal, or the other three people, to stop or come toward him. From there, Lindon made casual conversation with Bernal, asking basic questions about him, his history, his travel purposes, and the like. Law enforcement, at some point during the interaction, obtained without returning Defendants' identification cards and (later) the keys to the Element. Lindon identified Bernal's "nervousness" and "lack of being able to answer basic questions in a consistent manner" as factors that piqued his suspicion during the interaction. Lindon said, for instance, that Bernal claimed he was in Lexington for

4

"vacation," but could not identify a specific location; Bernal generically said he was going "downtown" on "vacation." Further, Bernal, though purportedly in Lexington for vacation, said he was leaving the "next morning," although he had just arrived late in the evening. The responses struck Trooper Lindon, with 14 years of police training and experience, as abnormal and suspicious. Bernal's and Perez's responses, especially the perceived inconsistencies (such as arguable differences between the purpose of the visit, the location of the overnight stay, and when they intended to leave) also struck Trooper Gabriel (and, for that matter, TFO Batista) as suspicious. Lindon, though, candidly recognized a "huge" language barrier and so requested an officer with Spanish fluency (DEA TFO Jose Batista) to assist around 10:26 p.m. Lindon spoke with the group for 10-15 minutes before Batista arrived.

Lindon, thus, made the initial contact with the group, but Gabriel, a K-9 unit, had arrived in his separate unmarked Tahoe "within moments" of Lindon at the McDonald's and soon joined in the conversation. Because Lindon was primarily speaking with Bernal, Gabriel engaged Perez in conversation. "After a substantial amount of time," Gabriel "offered them to sit down at a picnic table next to the Element," but he said he "did not direct her [Perez] to walk away or take her anywhere."

Lindon, working with Batista, also asked Bernal and Perez about controlled substances. Both denied the presence of any drugs in the Element, but Lindon specifically noted a significantly different reaction from Perez when he asked her about heroin. Perez, upon being asked that question, "paused and then made a bodily motion looking away, or losing eye contact; it was different than the other questions." Put another way, Perez "paused" and gave "a hesitant response." She looked the other way, hesitated, and then

responded negatively.[3] Lindon had asked Bernal for consent to search the Element; Bernal affirmatively orally consented to a search, a position the officers reaffirmed in Spanish after Batista arrived. Batista translated Bernal's answer as "yes, yes, go ahead." Batista asked Perez "if she had any problem with us searching the vehicle." She responded, "no, go ahead." Batista, describing himself under oath as a fluent Spanish speaker, expressed utterly no difficulty communicating or conversing with either Defendant in Spanish or translating between Defendants and other officers' communications.

Still, law enforcement did not search the Element, even after Bernal and Perez purportedly gave oral authorization in Spanish (and Bernal also gave consent in English). Approximately 20 minutes after he arrived on scene (thus, approximately 10:36 p.m.), Trooper Gabriel (who has over 2 years of experience as a K9 handler) deployed Pluto, his certified drug detection dog, who was on scene at the same time (but who had remained in the Tahoe until that point), on the Element. The Lindon tape shows that he told Bernal he had a dog on site 8 minutes into the discussion. Given the staging, the Court finds that Pluto was there from the start of the Lindon approach. Pluto, an aggressive alert dog, has been Gabriel's sole canine since the pair began K9-related work. Both Gabriel and Pluto

---

[3] Whether a pause, hesitant response, or deep breath is discernible on the audio recording was a point of contention at the hearing. The Court, upon numerous times auditing the recording, frankly does not hear much (if any) pause, hesitation, or breath. The Court does note the officers' harmonious and simultaneous observations and senses of such a reaction, viewed and heard contemporaneously and in person, from Perez. The physical setting and the visual element surely augmented the officers' ability to perceive the reaction they seamlessly described on the stand. Batista directly said that he could not hear on the recording what he observed and heard in person—*i.e.*, that the audio's inherent limitations and quality did not fully reflect every nuance of his in-person interaction with Perez. In the TFO's own words: "Listening and the visual is [sic] two different things."

are properly certified.[4] Their original certification came post-training on January 1, 2016, from the State of Ohio, whose certification standards mirror those of the KSP. [To ensure validity, KSP supervisors monitor the Ohio certification process.] The KSP most recently certified Pluto on October 11, 2017, and Pluto's certification has never lapsed since 1/1/16. Indeed, he re-certified in late 2016. Gabriel walked Pluto around the Element, conducting an open-air sniff of the vehicle. Pluto positively alerted to the presence of narcotics odor on the Element, near the driver's side door. Gabriel described a lesson from his training and experience that a positive hit on the driver's side door leaves "the whole passenger compartment . . . in play" for the actual location of narcotics due to odor's behavior emanating through the air and seeking an opening from the car from which to escape. The driver-side door seal, as the most used exit, can be such a spot. Only after Pluto's positive alert—around 11:00 p.m. with the sniff already having occurred—did Lindon and Gabriel begin searching the Element.

"Immediately," Lindon "noticed something with wrong with the floor" of the Element. Gabriel, for his part, immediately noticed a lot of "tampering" and modifications on the inside of the car. "It was obvious it wasn't factory. It had two layers; it was too high. It was just very obvious . . . that something was going on there that was abnormal." Gabriel particularly examined "the middle console" of the Element, which was not bolted to the car frame. "You could just lift the middle console up, which is not

---

[4] Gabriel stated that it was possible there were up to 20 prior instances where Pluto positively alerted but officers found no narcotics. The Court does not see this as meaningfully denigrating Pluto's reliability as a probable cause indicator; Pluto alerts to the presence of narcotics *odor*, not to narcotics themselves. Odor may, of course, "endure post-narcotics-removal from an area." *United States v. Harvey*, No. 5:17-CR-86-DCR-REW, 2017 WL 4018478, at *8 n.6 (E.D. Ky. Sept. 11, 2017); *see also United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) (noting the Sixth Circuit's "consistent" holdings "that the detection of a narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle" (citing numerous decisions)).

normal." Gabriel also noted that the dashboard came apart "relatively easily," only "held in with one or two screws." Lindon noted that, in the back seat area, one side was dusty and had not been disturbed. The side behind the passenger seat, though, "had been disturbed." The latch there "would not release the seat." Lindon moved on, leaving that area alone for the time, because he did not want to have to break anything in the vehicle.

After a "pretty lengthy" search that uncovered no contraband, Lindon and Gabriel, accounting for the obvious tampering and after-market alterations in the Element, decided it was necessary to revisit the suspicious left-side area. Gabriel specifically stated that, while he and Lindon had been systematic in beginning the search, he felt a "fresh pair of eyes" would be beneficial as the search continued. They called SA Stout and Trooper Giles to request other officers, who were already physically present near the McDonald's parking lot, for "more assistance" in conducting the search. When additional officers "joined the search" a little after midnight on July 26, 2017, Lindon (Gabriel had left in the interim, around 12:00 a.m.) showed Stout and Giles the suspicious passenger side setup. It took "all of" the agents on scene approximately 15 minutes to release the latch, and post-release, law enforcement could see that the flooring had been cut open. An officer lifted that area of flooring up and discovered a hinge, with a hidden compartment underneath it. Officers accessed the compartment, which contained a Kroger or Walmart bag containing a package with "800" written on it. The material in the package field tested positive for heroin. Law enforcement then effectuated probable cause arrests of Defendants, initiating the current case.

## II.    ANALYSIS

### A.    *General Legal Principles*

The Fourth Amendment prohibits unreasonable searches and seizures. In general, "[t]here are three kinds of permissible encounters between the police and citizens: (1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011) (internal quotation marks omitted); *see generally United States v. Flowers*, 909 F.2d 145, 147 (6th Cir. 1990) (per curiam); *United States v. Taylor*, 956 F.2d 572, 575-78 (6th Cir. 1992) (en banc).

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 111 S. Ct. 2382, 2386 (1991) (internal quotation marks and citation omitted). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 88 S. Ct. 1868, 1879 n.16 (1968).

The rule under *Terry* is that "'where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the

suspicious circumstances.' *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994)."
*United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004). Reasonable suspicion "must
be supported by specific and articulable facts that would 'warrant a man of reasonable
caution in the belief that the action taken was appropriate.'" *United States v. Blair*, 524
F.3d 740, 748 (6th Cir. 2008) (quoting *Terry*, 88 S. Ct. at 1880). "Reasonable suspicion is
more than an ill-defined hunch; it must be based upon a particularized and objective basis
for suspecting the particular person of criminal activity." *United States v. Collazo*, 818
F.3d 247, 257 (6th Cir. 2016). The "standard is less demanding than the probable-cause
standard." *Id.* "A determination regarding the existence of reasonable suspicion is based
on the totality of the circumstances, and a reviewing court views the evidence offered in
support of reasonable suspicion using a common sense approach, as understood by those
in the field of law enforcement." *Id.* (internal quotation marks and alteration removed).

Additionally, as relevant here, the Court recognizes the "basic rule that searches
conducted outside the judicial process, without prior approval by judge or magistrate, are
per se unreasonable under the Fourth Amendment—subject only to a few specifically
established and well-delineated exceptions." *United States v. McCraney*, 674 F.3d 614,
618 (6th Cir. 2012) (internal quotation marks removed). One example is the so-called
automobile exception. *See California v. Carney*, 105 S. Ct. 2066, 2068-69 (1985). Under
the automobile exception, "[i]f a car is readily mobile[5] and probable cause exists to

---

[5] Ready mobility means "[t]he mere inherent mobility of the vehicle." *United States v.
Howard*, 489 F.3d 484, 494 (2d Cir. 2007) (holding an inquiry into "the proximity of the
drivers and passenger to the vehicles" in an automobile exception situation to be
"misplaced"); *see also United States v. Graham*, 275 F.3d 490, 510 (6th Cir. 2001)
(noting that the *Labron* truck's ready mobility "was not questioned, despite the fact that .
. . the defendants had been arrested outside of the truck and prior to the truck search").
Indeed, as the Sixth Circuit has directly stated, a vehicle's mere "mobility" satisfies this

believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 116 S. Ct. 2485, 2487 (1996) (per curiam). The probable cause determination (there and in all cases) generally requires a common sense, totality of the circumstances assessment of the basis for a seizure or search. *See, e.g., United States v. Torres-Ramos*, 536 F.3d 542, 554-55 (6th Cir. 2008). A court must determine whether "'the facts and circumstances within [the officers'] knowledge and of which [they] had reasonably trustworthy information [are] sufficient to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *United States v. Hughes*, 606 F.3d 311, 320 (6th Cir. 2010) (quoting *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005)). The standard requires "more than mere suspicion" but not "evidence to establish a prima facie case . . . much less evidence sufficient to establish guilt beyond a reasonable doubt." *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998). Importantly, the probable cause standard is objective. "Subjective intentions play no role in probable cause Fourth Amendment analysis." *Schneider v. Franklin Cnty.,* 288 F. App'x 247, 251 (6th Cir. 2008) (citing *Whren v. United States*, 116 S. Ct. 1769, 1773-74 (1996)). The Court eschews hyper-technicality here and commonsensically probes and considers evidence. "If probable cause justifies a search of a vehicle . . ., then that probable cause extends to justify the search of every part of the vehicle and all containers found therein in which contraband could be hidden." *United States v. Crotinger*, 928 F.2d 203, 205 (6th Cir. 1991).

Further, in a dog-sniff situation, the probable cause determination is considerably more streamlined: an "alert by a properly trained and reliable drug-detection dog is

---

element. *Id.* at 511; *see also United States v. Brookins*, 345 F.3d 231, 238 (4th Cir. 2003) (holding "readily mobile" means "operational").

sufficient to establish probable cause for the presence of a controlled substance." *United States v. Winters*, 782 F.3d 289, 304 (6th Cir. 2015); *see also, e.g.*, *United States v. Sharp*, 689 F.3d 616, 618-19 (6th Cir. 2012) (same).[6] Indeed, "such probable cause extends to every part of the vehicle and all containers found therein in which the object of the search could be hidden." *Winters*, 782 F.3d at 304 (internal quotation marks removed).

### B.    The Parking Lot Interaction

The Court first addresses the interaction between law enforcement and Defendants in the McDonald's parking lot. The Court concludes, for the reasons that follow, that law enforcement had reasonable suspicion to conduct a *Terry* stop of Bernal and Perez and that the interaction, per the record evidence, did not violate the Constitution.[7]

These facts, as the evidentiary hearing well showed, first require consideration of collective knowledge doctrine principles. "It is well-established that an officer may

---

[6] *See also Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013) ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.").

[7] The Court thus forgoes consideration or analysis of a consensual encounter theory of the parking lot interaction. The United States did not defend the interaction as a consensual encounter in its brief. Some officers, as expressed on the stand, may have viewed the interaction as legitimate on those terms, but any such view is immaterial because the Court concludes that officers had reasonable suspicion for a *Terry* stop, a higher hurdle. Without question, the initial approach involved no force or authority. Over the course of the interaction, however, Trooper Lindon did collect, and authorities held, the adults' IDs, and eventually the keys to the Element. At some point, the lengthy interaction crossed the seizure line—the Court simply treats it as a justified *Terry* seizure from the start.

conduct a stop based on information obtained by fellow officers." *United States v. Lyons*, 687 F.3d 754, 765-66 (6th Cir. 2012). The collective knowledge doctrine

> recognizes the practical reality that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another. Because officers must often act swiftly and cannot be expected to cross-examine their fellow officers about the foundation of transmitted information, [courts] impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop. Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion. By imputing the investigating officer's suspicions onto the responding officer, without requiring the responding officer to independently weigh the reasonable suspicion analysis, the collective knowledge doctrine preserves the propriety of the stop and avoids crippling restrictions on our law enforcement.

*Id.* at 766 (internal citations, quotation marks, footnote, and alteration removed). There are "three separate inquiries" when applying the collective knowledge doctrine: "(1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Id.* at 767; *see also United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014) (explaining that a specialized portion of the collective knowledge doctrine—the "working as a team" concept—justifies that when agents are "in close communication with one another," "the group's knowledge of a fact may be considered by a reviewing court, not just the knowledge of the individual officer who physically effected the arrest" (internal quotation marks removed)).

13

Troopers Lindon and Gabriel "conduct[ed] a stop based on information obtained by fellow officers." *Lyons*, 687 F.3d at 765-66. The collective knowledge doctrine is broad and permits "police officers [to] act on directions and information transmitted by one officer to another . . . even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop." *Id.* at 766. Whether Lindon and Gabriel knew all central or supporting facts "is immaterial[.]" *Id.* at 768. Instead, "all the information they needed to act" was "a request by the DEA (subsequently found to be well-supported) that they execute the . . . stop in the expectation that illegal narcotics would be found in the vehicle." *Id.* at 768-69. Further, all three *Lyons* inquiries are satisfied here: Lindon and Gabriel acted in objective reliance on the information received; the DEA had facts supporting reasonable suspicion to stop Defendants (as the Court will detail below); and the stop was no more intrusive than it would have been for the DEA to make directly. The Court thus concludes that, per the Sixth Circuit's developed collective knowledge doctrine, expressed in *Lyons* and *Duval*, it may consider law enforcement's collective knowledge in the reasonable suspicion and McDonald's parking lot interaction analysis.[8]

The Court, thus, considers the facts in law enforcement's collective knowledge on July 25, 2017. *Lyons*, 687 F.3d at 765-66; *Duval*, 742 F.3d at 253. The Court concludes that those facts coalesce to satisfy the reasonable suspicion standard, on this record. As

---

[8] Defense counsel sharply impugns law enforcement for alleged "parallel construction." The Court sees nothing improper, in any of the case papers, and thus rejects any defensive allegation of bad faith or attempt to affirmatively mislead by law enforcement. The Government detailed its proof at the hearing. The underlying Complaint was wholly proper; the reports are neutral on the particular role of the CI, and the Court perceives nothing misleading in the proof or record. Law enforcement often tries to protect its information sources, and endeavoring to do so here, an effort with no ill effect on the defense, was not improper.

Defendants argue at length, indeed, all observed conduct leading to the stop could well have had an innocent explanation. *See, e.g.*, *United States v. Arvizu*, 122 S. Ct. 744, 753 (2002) ("Respondent argues that we must rule in his favor because the facts suggested a family in a minivan on a holiday outing. **A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct**. . . . Undoubtedly, each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others. Taken together, we believe they sufficed to form a particularized and objective basis for Stoddard's stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment." (emphasis added)). But, taken collectively—as "building blocks," to use Agent Moore's phrasing on the stand—the facts pass the relatively low reasonable suspicion threshold. *See, e.g.*, *United States v. Urrieta*, 520 F.3d 569, 580 (6th Cir. 2008) ("[W]hile any one of these facts may not amount to reasonable suspicion on its own, taken together they do. More importantly, a totality of the circumstances analysis prohibits us from discounting certain factors merely because, separately, they could potentially have an innocent explanation." (internal quotation marks and alteration omitted)).

To reiterate the standard: reasonable suspicion is "more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *Collazo*, 818 F.3d at 257. "A determination regarding the existence of reasonable suspicion is based on the totality of the circumstances, and a reviewing court views the evidence offered in support of reasonable suspicion using a common sense approach, as understood by those in the field of law enforcement." *Id.* (internal quotation marks and alteration removed). Reasonable suspicion "must be

supported by specific and articulable facts that would 'warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Blair*, 524 F.3d at 748 (quoting *Terry*, 88 S. Ct. at 1880). The "standard is less demanding than the probable-cause standard." *Id.*

Consider what law enforcement knew when Lindon and Gabriel approached Bernal, Perez, and the two children.[9] Officers knew to expect:

_____

[9]     The Court concludes that, on these facts and as relevant here, law enforcement could validly rely on information received from the CI in this case. The inquiry probes the totality of the circumstances, giving consideration to the CI's veracity, reliability, and basis of knowledge. *See, e.g.*, *United States v. Thomas*, 605 F.3d 300, 307-08 (6th Cir. 2010); *United States v. Dyer*, 580 F.3d 386, 390-91 (6th Cir. 2009). Independent police corroboration is an important factor. *Dyer*, 580 F.3d at 390-91.
        The CI was <u>known</u> and working with LPD, per information Det. Evans provided the DEA. SA Moore himself testified that this CI had worked with both the DEA and LPD on various prior occasions and that he had been involved in previous operations this CI coordinated. The DEA-6 calls him / her "a DEA confidential source (CS)." According to Moore and Batista, the CI provided a detailed, specific tip (though not one, of course, containing *every possible* detail) regarding the suspected arrival of heroin in this District—including the approximate time and place of the arrival, the alleged drug origin, the suspected drug type and general quantity, and the involved vehicle's specific state of licensure. Additionally, and importantly to the Court, the CI proved his reliability and basis of knowledge as the events of July 25 unfolded via the CI's contemporaneous communications, transmitted to the DEA through Evans, with the person setting up the heroin deal. Thus, the CI proved, in a reasonable assessment of the totality, his / her reliability via his suspected real-time communication with the driver of the out-of-state maroon SUV, which arrived contemporaneously with Defendants' Element at the McDonald's and law enforcement reasonably viewed as connected with the overall occurrence, and through his / her (borne out in reality) estimation that the arrival would be later in the previously estimated timeframe (*i.e.*, closer to 9:00 p.m.). *See, e.g.*, *Alabama v. White*, 110 S. Ct. 2412, 2417 (1990) (crediting an anonymous tipster's accurate prediction of future behavior as bolstering credibility so as to justify a stop). Indeed, law enforcement independently corroborated the CI's story by personally, first-hand matching his / her communications with observations of the maroon SUV driver speaking on a cell phone.
        The Court has considered the totality here and finds, though this record is not perfect on the question, that there are sufficient indicia of CI reliability, given the communication, the level of tip detail and accurate future prediction, and federal and state law enforcement's prior work with him / her, for officers (and now the Court) to rely on information, such as it was, received from him / her in the reasonable suspicion calculus. The specific, granular tip gave law enforcement reason to be there, watching for the

--      A large (kilo-quantity) delivery of heroin;

--      In the McDonald's parking lot on Stanton Way in Lexington;

--      Between 5:30 and 9:00 p.m. on July 25, 2017;

--      Delivered by a vehicle with an Illinois license plate.

Officers further knew that:

--      The delivery got "pushed back" during the course of the day, with the Illinois-plated courier expected to arrive closer to the 9:00 p.m. bookend;

--      A Honda Element with an Illinois plate in fact arrived at the Stanton Way McDonald's at 9:16 p.m. on July 25, 2017;

--      This Element arrived contemporaneously with a maroon SUV with an out-of-state plate, whose driver's cell phone use synced with the CI contemporaneously communicating with the person arranging the details and delivery in the suspected heroin deal;

--      The occupants of the Element lingered, with no obvious reason, inside the McDonald's for approximately 45 minutes after concluding their meals (as Moore directly observed);

--      The adult male occupant (Bernal) periodically—more than twice—while inside the McDonald's stood up from his table, walked over to a window, and looked out, fixing his gaze on the Element—*i.e.*, arguably keeping an eye on his vehicle; and

--      As the occupants were lingering at the McDonald's, Bernal had a cell phone in his hand.

---

delivery vehicle, and screening for other confirmatory or contradictory information as the night elapsed.

17

The Court has assessed the totality of the circumstances and viewed the evidence using a common sense approach, as understood by those in the field of law enforcement, and the Court concludes that the above-cited considerations coalesce to form reasonable suspicion for the initial encounter. To be sure, each step along the path *could* have been innocent; Bernal and Perez, driving an Illinois vehicle, *could* have merely been taking two minor children on a vacation (or other benign trip) and happened to stop at the Stanton Way McDonald's at approximately the time law enforcement was expecting arrival of a drug shipment in an Illinois vehicle. The group *could* have fortuitously pulled in near in time with an SUV whose driver was reasonably seen as in current communication with the CI. The group *could* have decided that, after a long day of driving, a 45-minute rest, doing nothing, around 10:00 p.m. in the McDonald's sounded like a good plan. Bernal *could* have simply been a conscientious car owner, desiring to keep an eye on the Element to ensure its safety in the parking lot. Officers, to be sure, directly observed no criminal conduct by Bernal or Perez.

But, to the Court, law enforcement reasonably assessed this amalgamation of circumstances and reasonably suspected Bernal and Perez of criminal activity. The above facts, in the Court's view, combine to form a particularized and objective basis for suspecting Defendants of criminality. Thus, Bernal and Perez, driving a vehicle with an Illinois plate, arrived at the exact location at the approximate time that law enforcement anticipated a heroin delivery with those specifics. They lingered, with no obvious explanation, inside the McDonald's for 45 minutes after concluding their meal, after 10:00 p.m., while Bernal periodically looked out a window to monitor the Element and otherwise sat inside clutching a cell phone. Officers reasonably viewed the overall

18

scenario, employing their years of training and experience with similar circumstances, as a suspicious one. *See, e.g.*, *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) ("The totality of the circumstances analysis permits police officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (internal quotation marks removed)). The Court agrees. *See, e.g.*, *United States v. Hunter*, 333 F. App'x 920, 924 (6th Cir. 2009) (holding that "information from a known CI" that "was corroborated" by the defendant "driving in the [identified] vicinity on the evening in question in the car described by the CI" is "sufficient" for reasonable suspicion); *United States v. Woods*, 385 F. App'x 914, 918 (11th Cir. 2010) (affirming stop based on information from a CI "that Woods would be driving a black Hyundai Azera in the Georgia Dome area around noon"); *United States v. Allen*, 175 F. App'x 536, 539 (3d Cir. 2006); *King v. City of Eastpointe*, 86 F. App'x 790, 805 (6th Cir. 2003) (considering, as part of reasonable suspicion, one suspect "go into a restaurant" and another suspect "return from the restaurant without food"); *United States v. Sanchez*, 398 F. App'x 840, 843 (3d Cir. 2010) (considering, as one factor in the reasonable suspicion analysis, that defendants "loitered around and in the McDonald's with an unidentified individual without buying food"); *United States v. Williams*, 199 F. App'x 828, 833 (11th Cir. 2006) (considering a defendant's companion "lingering in medicine aisles at K-Mart" as a reasonable suspicion factor); *United States v. Lindsey*, 451 F.2d 701, 703 (3d Cir. 1971) (noting that *Terry* itself involved a suspect "who appeared to be lingering an unusual length of time" in a particular area); *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) (considering a suspect "glancing back to the Chevy" as part of the reasonable

suspicion analysis); *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990) (considering suspects' "peculiar behavior," their "continuous furtive glances," and their generally "nervous . . . behavior" in the reasonable suspicion analysis); *United States v. Briggs*, 720 F.3d 1281, 1286-87 (10th Cir. 2013). Reasonable suspicion justified law enforcement's investigative detention of Bernal and Perez when they eventually exited the McDonald's. There were particular reasons for authorities to stop the couple and inquire further into the scene.

Such an investigative detention must, of course, "be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). "While there is no rigid time limitation on the lawfulness of a *Terry* stop," a court "must examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant[s]." *Id.* (internal quotation marks omitted). "Although an officer may have reasonable suspicion to detain a person . . . for investigation, the officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997).

Here, the Court concludes, considering all the circumstances, that law enforcement complied with applicable investigative detention durational limitations. As officers recounted on the stand, the personal interactions with Bernal and Perez immediately served only to heighten suspicions, not dispel them. First, Bernal had the immediate, slight physical reaction to take a step away from Lindon as he approached. Second, the pair gave illogical and somewhat inconsistent answers to law enforcement's

questioning on fundamental matters, such as the nature and duration of their trip, where they were spending the night, and their plans the following day. Officers reasonably were suspicious of a group allegedly on "vacation" in Lexington, but spending just a few overnight hours in town.[10] Third, and importantly, per the sworn proof, Perez had a significantly different reaction when Batista asked her about the presence of heroin, pausing, breaking eye contact, and responding differently than with the other questions. *See, e.g.*, *United States v. Johnson*, 620 F.3d 685, 694-95 (6th Cir. 2010) (describing the Sixth Circuit's jurisprudence concerning consideration of a suspect's movement away from an officer in the reasonable suspicion analysis and collecting cases); *United States v. Orsolini*, 300 F.3d 724, 727-28 (6th Cir. 2002) (considering suspects' "inconsistent stories" as part of the reasonable suspicion analysis); *United States v. Bonilla*, 357 F. App'x 693, 699 (6th Cir. 2009) ("Inconsistencies in the claimed purpose of a trip may be grounds for reasonable suspicion."); *Winters*, 782 F.3d at 299-300 (considering "conflicting or implausible explanations of travel plans," "inconsistent explanations of the duration of their stay," and a lack of a specific "name or location of their destination" in the reasonable suspicion calculus); *United States v. Stepp*, 680 F.3d 651, 666 (6th Cir. 2012) (considering "vague" and "dubious travel plans" in the reasonable suspicion analysis); *id.* (considering a suspect's "noticeable change in . . . behavior when Deputy Lawson asked him relatively basic follow-up questions" in the reasonable suspicion analysis); *United States v. Tillman*, 543 F. App'x 557, 562 (6th Cir. 2013) (considering a failure to "make direct eye contact" as a reasonable suspicion factor); *United States v.*

---

[10] The tape shows they might have planned to go to Ohio the next day or the day after. There was no itinerary, no set destination. The kids did not know the family was in Lexington. This could have been a family lark, or it could have been a drug drop—police had reason to explore for the latter.

*Ross*, 91 F. App'x 482, 484 (6th Cir. 2004) (considering "Ross's failure to make eye contact" as a factor amounting to reasonable suspicion); *United States v. Garcia*, No. 15-cr-28(01) and (02), 2015 WL 8660838, at *5 (W.D. La. Sept. 23, 2015) (considering that the suspect "broke eye contact" as part of the reasonable suspicion analysis).

The Court further notes that law enforcement, in the interactions with the couple, learned that the family was from Hammond, Indiana (near Chicago). The DEA-6 shows that the DEA had run the plate and found the Element as registered to a different person (a person with an Illinois address). Thus, Defendants were in an Illinois car, belonging to another, and in Lexington at a time and place, and in a vehicle, directly confirmatory to a heroin delivery.[11] The family came off the road, ate, and then sat for 45 minutes in a McDonald's mere yards from their purported hotel, an interval in which Bernal repeatedly checked on the Element and then sat, phone in hand. The suspicious elements were specific, continued to grow as time passed, and supported the manner and duration of intervention.

In the investigational timeline, approximately 28 minutes—and certainly less than 40 minutes[12]—elapsed between Lindon approaching the group as they exited McDonald's (initiating the *Terry* stop) and Pluto positively alerting on the Element. The Court concludes that this length of detention, given the pre-interaction reasonable suspicion and the further suspicions raised in the conversations, is undoubtedly reasonable and no longer than necessary, in the circumstances. *See, e.g.*, *Davis*, 430 F.3d at 354 (approving a 30 to 45 minute detention while awaiting a drug dog).

---

[11] On the tape, at 20:15, Trooper Gabriel remarks that Perez's unlocked phone showed her GPS directed toward the specific location of the McDonald's. This was a destination, not a random stopping point.

[12] At oral argument, the prosecutor estimated this period to be approximately 30 minutes.

### C.    The Vehicle Search

Next, the Court addresses the search of the Honda Element, which the automobile exception legitimizes.[13] Under the automobile exception, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Labron*, 116 S. Ct. at 2487.

First, the Element was obviously "readily mobile." It was capable of moving, all the requirement demands. *Graham*, 275 F.3d at 511; *Howard*, 489 F.3d at 494; *Brookins*, 345 F.3d at 238. Bernal and Perez had driven the Element to the McDonald's minutes earlier that same day, and it remained in the parking lot, ready to be driven at any time. Trooper Lindon directly testified that the Element was a "functioning" vehicle. Neither Defendant contests the ready mobility prong.

Second, probable cause existed to believe the Element contained contraband. An "alert by a properly trained and reliable drug-detection dog is sufficient to establish probable cause for the presence of a controlled substance." *Winters*, 782 F.3d at 304; *see also, e.g.*, *Sharp*, 689 F.3d at 618-19 (same). As with any probable cause analysis, a court

---

[13]    The Court forgoes consideration or analysis of either Defendant's alleged consent to search the Element. Law enforcement, acting conservatively, did not begin a search until post-dog-sniff, even after purportedly receiving both Defendants' consent to search. Thus, consent, in this scenario, is not determinative. Regardless of whether officers properly received consent to search, Pluto's positive hit on the Element validates the search, which (again) began only post-sniff. Further, the dog was on-site and the sniff introduced no delay in the otherwise valid event. This obviates any need to scrutinize consent or await translation criticism by a defensive linguist.

Even if the consent was invalid, a question not decided, Trooper Lindon did twice hear from Bernal that he could search the vehicle, once in English and once with the language assistance of TFO Batista. Auditing the tape shows that Bernal understood most of what Lindon said and all of what Batista said. This interaction, playing out in real time, reasonably contributed to the length of the *Terry* stop. Trooper Lindon took care to involve a Spanish speaking officer and then to have Pluto's validating run before launching the search. This all happened within a 30 minute window, a period during which Defendants continued to supply information fortifying the stop basis.

employs the totality-of-the-circumstances when evaluating a dog's credentials and reliability. *Harris*, 133 S. Ct. at 1056. Pluto, whom the uncontradicted proof indicates was properly certified by a bona fide organization, positively alerted to narcotics odor at the Element, providing a full basis for a search. *See Winters*, 782 F.3d at 304; *Harris*, 133 S. Ct. at 1057 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs."). Gabriel's testimony established Pluto's certifications and qualifications, and the Court finds, on this record, Pluto to be properly trained, reliable, and fully qualified to accurately alert to the presence of the odor of controlled substances. Gabriel's credentialing testimony stands alone and validates Pluto as a suitable probable cause indicator.

To address Defendants' other particular arguments, the Court discusses three additional issues:

*First*—the Court concludes that law enforcement did not unreasonably or illegally conduct the Element search. Automobile-exception-based probable cause to search "extends to **every part of the vehicle** and all containers found therein in which the object of the search could be hidden." *Winters*, 782 F.3d at 304 (internal quotation marks removed; emphasis added); *United States v. Ross*, 102 S. Ct. 2157, 2173 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of **every part of the vehicle** and its contents that may conceal the object of the search." (emphasis added)). Indeed, once a dog properly alerts, "officers clearly ha[ve] probable

24

cause, not only to . . . search the vehicle, but to dismantle it as well." *United States v. Guerrero-Sanchez*, 412 F. App'x 133, 141 (10th Cir. 2011) (panel including then-Judge Gorsuch). Moreover, as relevant on these facts, "evidence of a hidden compartment not only contributes to probable cause to search a vehicle but supports an officer's dismantling of a vehicle to find it." *Id.*

Courts often and without hesitation approve officers searching "every part of a vehicle which may conceal the object of the search." *See, e.g.*, *United States v. Zucco*, 71 F.3d 188, 191-92 (5th Cir. 1995) (affirming law enforcement "dismantling a wall of the vehicle" and searching "the interior of the walls" to probe the existence of cocaine); *United States v. Patterson*, 65 F.3d 68, 71 (7th Cir. 1995) (endorsing officers "tak[ing] apart the tailgate of Patterson's GMC Jimmy" when "probable cause [exists] to believe that drugs were inside the vehicle" and explaining that "[u]nder the automobile exception . . ., all parts of a vehicle may be searched without a warrant if there is probable cause to believe the car contains contraband or evidence"); *United States v. Alverez*, 235 F.3d 1086, 1089 (8th Cir. 2000) ("Because the troopers had probable cause to believe that contraband was secreted in the vehicle, in particular in the spare tire, they could lawfully complete a full and thorough search of the tire, including dismantling or damaging it."); *United States v. Ruffin*, No. 04-CR-48-S, 2004 WL 1447815, at *5 (D. Wis. June 21, 2004) ("[B]ecause there was probable cause to search the Navigator, the subsequent search and the dismantling of the console were reasonable under the Fourth Amendment."); *United States v. Baez*, No. 14-cr-20631, 2015 WL 3464113, at *6 (E.D. Mich. June 1, 2015) (probable cause to search justified "a thorough, invasive, immediate, and on-the-scene search of Baez's vehicle"). Add to these harmonious case principles the

25

officers' immediate observations here of obvious after-market interior alterations and abnormalities (including Lindon's prompt notice of something wrong with the floor, the latch and seat peculiarities, the middle console's detachment from the car's framework, and (of course) the ultimate discovery of a hinge on the floor concealing a secret compartment). Considering the above uncontradicted case law and the factual particularities, officers here did not violate the Constitution in the manner by which they searched the Element, including by physically altering or disassembling the interior, seats, or flooring.

*Second*—the Court concludes, per the hearing testimony, that there in reality was but one "search" of the Element, extended though it was, and that the search did not violate the Constitution. Trooper Lindon directly testified that Agent Stout "joined in" and "assisted" with Lindon's and Gabriel's ongoing search—*not* that Lindon and Gabriel concluded a "first" search and then that Stout re-initiated a "second" search. Trooper Lindon's testimony directly showed one fluid, ongoing search of the Element. He phrased the decision to involve Stout and Giles as one seeking more assistance in the continuing search. Lindon's testimony stood alone on this point; the Court thus concludes that there was one, enduring search of the Element—one, to be sure, in which different officers participated at different points, but one continuing interaction with the vehicle nevertheless.

Regardless, as a sister District has thoroughly summarized, there "are no temporal or numerical limitations on searches under the automobile exception." *United States v. Dowl*, 229 F. Supp. 3d 603, 608-09 (E.D. Mich. 2017) (collecting and analyzing Supreme Court and Circuit precedent supporting this proposition). Thus, even if the DEA did

26

perform a "second" search on the Element, the officers' persisting dog-sniff-based probable cause justified searching "until the contraband was found and seized." *Guerrero-Sanchez*, 412 F. App'x at 142; *see also, e.g.*, *Farkarlun v. Hanning*, 855 F. Supp. 2d 906, 926 (D. Minn. 2012) ("[C]ontinuing searches over a period of time with the same factual basis for probable cause are not per se unconstitutional or unreasonable. *Cf. United States v. Carter*, 854 F.2d 1102, 1107 (8th Cir. 1988) (holding 'return search' conducted several hours after first search did not violate Fourth Amendment)."); *United States v. Donahue*, 764 F.3d 293, 301 (3d Cir. 2014) ("[O]ur analysis does not distinguish among the government's searches starting with Archuleta's search, followed by Willeke's search, and concluding with the opening of the closed bags. We see nothing in the Supreme Court's jurisprudence to indicate that the automobile exception may justify only a single search of a seized vehicle. To the contrary, the Court has based its reasoning allowing warrantless searches of vehicles in part on the diminished expectation of privacy in a vehicle, and thus the Court's reasoning supports the conclusion that so long as the government maintains continuous control over the vehicle it needs probable cause only for its initial search and seizure and that subsequent searches should be viewed as part of an ongoing process.").

*Third*—the Court concludes that Defendants' continued detention during the post-dog-sniff search of the Element was undoubtedly justified. Armed with probable cause that Defendants' vehicle contained contraband via Pluto's positive alert, officers quite validly continued Defendants' detention pending the outcome of the resulting search of the Element.[14] *See, e.g.*, *United States v. Perez*, 440 F.3d 363, 372-73 (6th Cir. 2006);

---

[14] *See also, e.g.*, *United States v. Bohannon*, 225 F.3d 615, 616 (6th Cir. 2000) (endorsing "[l]aw enforcement officials['] . . . authority to detain" involved individuals "while a

*Davis*, 430 F.3d at 353-54; *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999);

*United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (en banc); *Taylor v. Liss*, No.

05-71728, 2006 WL 1851096, at *6 (E.D. Mich. July 5, 2006) ("[T]he K-9 indicated that

there were drugs in the vehicle. Therefore, the detention following the dog sniff was

reasonable. . . . Troopers Liss and Sattler were able to detain Plaintiffs after the initial

*Terry* stop because they had probable cause to believe that there were drugs present in the

vehicle." (emphasis removed)). To be sure, the use of a "drug-sniffing dog was a

minimally intrusive means of investigating whether the officers' suspicions that

[Defendants'] vehicle contained narcotics were valid." *Davis*, 430 F.3d at 355. The dog's

positive alert gave officers probable cause to search every part of the Element; the after-

market alterations and interior peculiarities themselves, including the secret, hinged

compartment under the back seat, complicated the search and undoubtedly extended the

search duration. Indeed, the Element's interior oddities necessitated that the Troopers

request additional law enforcement assistance to effectuate a full examination of the

vehicle. The Court easily concludes that Defendants' detention during the thorough

search here, "given the way the drugs were effectively hidden in the vehicle," was of a

_____

proper search is being conducted"); *Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006) ("Thus, the doctrine of *Michigan v. Summers*, permitting police officers to detain individuals during a search, and the principle of *Muehler*, holding that the authority to detain incident to search is categorical, apply to all searches upon probable cause, not just to searches for contraband."); *Burchett v. Kiefer*, 310 F.3d 937, 943 (6th Cir. 2002); *Pecsi v. Doyle*, 940 F.2d 661, No. 90-4039, 1991 WL 137597, at *2 (6th Cir. July 26, 1991) (table) (per curiam) ("We agree with the government that officers searching a location have the authority to detain the occupants while a proper search is conducted." (internal quotation marks and alteration removed)); *United States v. Rowe*, 694 F. Supp. 1420, 1424 (N.D. Cal. 1988) ("Although the *Summers* Court did not define the duration of permissible detention, it apparently contemplated that occupants could be detained long enough for police to complete extensive searches."); *Butler v. City of Sacramento*, No. CIV. S-07-755 LKK/DAD, 2007 WL 2275218, at *3 (E.D. Cal. Aug. 7, 2007) (recognizing, in the vehicle context, that a vehicle occupant may be detained during "the period of the search").

reasonable duration, was no longer than necessary, and did not offend the Constitution. *See, e.g.*, *Guerrero-Sanchez*, 412 F. App'x at 141-42 (approving an approximately 2-hour long search) (internal quotation marks removed); *United States v. Olivera-Mendez*, 484 F.3d 505, 512-13 (8th Cir. 2007) (approving a 6-hour search when the defendant secreted cocaine in a "hidden compartment" in his vehicle); *Baez*, 2015 WL 3464113, at *6 (discovery of "a suspicious aftermarket wire" justified an extended, "thorough[, and] invasive" search).

Accordingly, per this analysis, law enforcement's search of the Element fits within the automobile exception and did not, more broadly, in any way violate the Constitution.

## III.    CONCLUSION

Per the above analysis, law enforcement acted within the bounds of the law in all respects in this case.[15] The Court thus **RECOMMENDS** that the District Judge wholly **DENY** the joint effort to suppress (DE #27).[16]

---

[15] Because the Court so concludes, it need not engage in a separate analysis of the propriety of suppression as a remedy (or any possibly applicable exceptions). Because law enforcement acted within the law in this case, there is no improperly obtained evidence to exclude and no deliberate, reckless, or grossly negligent police conduct to deter. *See Davis v. United States*, 131 S. Ct. 2419, 2427-28 (2011); *Herring v. United States*, 129 S. Ct. 695, 702 (2009).

[16] Consistent with the above analysis, the Court **DENIES** DE #44 to the extent it seeks to re-open the suppression proof. The United States indicated that there is no additional discovery to disclose regarding the maroon SUV or contemporaneous communication with the CI, *see* DE #54, so the request to re-open is largely moot in that regard. Further, though, the Court sees any additional proof as unlikely to meaningfully to contribute to the analysis. There is simply nothing indicative of helpful information for the defense, on the suppression issues. Specifically regarding the proposed linguist: (a) everyone knew the tape content would be in play; indeed, the defense made the tape part of the record; (b) Batista was subject to cross, and his testimony and the tape content show he was able to communicate effectively with Defendants (and the consistent content even from the Lindon portion shows this); (c) "revisar" includes "to inspect," *see, e.g.*, Revisar,

*     *     *     *     *

The Court principally directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. To ensure viability of the schedule, a party must file any objection(s) **within ten days**, with response(s) due **within ten days** of the filing of any objection(s), subject to any revision by Judge Reeves. A party may reply in support of any objection(s) only with leave of the Court, obtained via motion. The parties should consult the statute and Federal Rule of Criminal Procedure 59(b) for specific appeal rights and mechanics. Failure to object in accordance with the Rule waives a party's right to review.[17]

This the 26th day of October, 2017.



Signed By:

_Robert E. Wier_

United States Magistrate Judge

---

http://www.spanishdict.com/translate/revisar (last visited Oct. 26, 2017); and (d) consent is not a core issue in the ultimate analysis. *See also supra* n.13.

[17] To the extent this document constitutes an Order resolving a non-dispositive pretrial matter under 28 U.S.C. § 636(b)(1)(A) (regarding DE #44), the Court provides the following appeal notice: Any party objecting should consult § 636 and Fed. R. Crim. P. 59(a) concerning its right of and the mechanics for reconsideration before the District Court. Failure to object waives a party's right to review.